UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:25-CR-303-FL-RJ-1

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MILTON ERMILO ARREAGA ROBLERO | MOTION TO DISMISS INDICTMENT,<br>INCORPORATED MEMORANDUM OF LAW<br>and REQUEST FOR HEARING<br><br>Fed. R. Crim. P. 12(b)(1), 12(b)(3)(B)(v)<br>U.S. Const., Amend. IV & V |

The defendant, Milton Ermilo Arreaga Roblero, by and through counsel, respectfully moves to dismiss the two-count indictment on three grounds.

First, based on the indisputable video evidence, the government cannot prove the two counts by proof beyond a reasonable doubt. Fed. R. Crim. P. 12(b)(1), 12(b)(3)(B)(v). Second, the arresting immigration officers did not have an objectively reasonable basis to mistakenly target Mr. Roblero or to use in constitutionally excessive force against him. U.S. Const. Amend. IV. Third, the Court should exercise its inherent judicial supervisory authority to dismiss the indictment, to remedy the immigration officers' egregious actions during and after the arrest. U.S. Const. V.

Mr. Roblero also requests a hearing on this motion. Finally, counsel will hand-deliver a courtesy copy of this motion, the attachments, and flash drive with the video evidence to the Clerk of Court on Monday, February 23, 2026.

**PROCEDURAL HISTORY**

A criminal complaint filed December 3, 2025, charged Mr. Roblero with violating 18 U.S.C. § 111, alleging he "forcibly" assaulted, resisted or impeded federal immigration officers

1

on December 2, 2025. DE 1. Following Mr. Roblero's December 5, 2025 initial appearance, undersigned counsel moved to continue the probable cause and detention hearings. DE 10. The Court granted the motion and set these hearings for December 16, 2025.

On December 16, 2025, shortly before the scheduled hearings, United States Magistrate Judge Robert T. Numbers II, informed counsel that the grand jury had just returned an indictment that morning, thereby cancelling the scheduled probable cause hearing. DE 12, 15. After hearing testimony, reviewing defense exhibits, and hearing argument, Judge Numbers ordered Mr. Roblero detained pending trial. DE 17.

Count I of the indictment charges Mr. Roblero with violating 18 U.S.C. §§ 111(a) and (b), alleging he "forcibly" assaulted a federal officer with a "deadly weapon" with intent to commit another felony. Count II charges him with "willfully" damaging three government vehicles, resulting in damages greater than $1000, in violation of 18 U.SC. § 1361. DE 12. The pretrial motions deadline is February 20, 2026. DE 20. Arraignment is set for March 12, 2026. Mr. Roblero will enter a plea of not guilty to both counts.

## FACTS

The Complaint's supporting affidavit alleges that on December 2, 2025, Enforcement and Removal Officers (ERO) from Immigration and Customs Enforcement (ICE) planned to administratively arrest Maynor Godinez-Mendez for placement in immigration removal proceedings. DE 1, para. 5.

A. **The Asserted "Pattern of Life" Investigation**

FBI Special Agent Gregory Gary submitted the affidavit, based primarily on after-the-fact interviews of the ERO officers involved. Agent Gary stated the officers had previously established Mendez's "pattern of life," indicating he would travel from a residence at 10211

2

Chapel Hill Road, Morrisville, to his place of work at the nearby Sangam Mart, 10300 Chapel Hill Road, Morrisville. DE 1, paras.5-6. This "pattern of life" supposedly confirmed Mr. Mendez would be driving a red Honda Civic, "known to be utilized" by him. *Id.*, para.5.

At least eight ICE officers and agents participated in the planned administrative arrest of Mr. Mendez on December 2, 2025. Five ERO officers had primary responsibility. Three agents from Homeland Security Investigations (HSI) participated as a Quick Reaction Force (QRF).

Counsel does not have the names of these officers and agents or their contact information. The Government has refused to produce this requested information, only providing their initials. Nor has counsel received requested discovery that details the supposed "pattern of life" investigation and surveillance conducted prior to and on December 2, 2025. Thus far, the discovery produced by the Government only indicates that an unspecified number of EROs conducted surveillance on one day, November 29, 2025.

**B. December 2, 2025 ERO Interdiction: Officers' Version & the Actual Evidence**

1. Officers' Version

On December 2, 2025, an unspecified number of Federal Deportation Officers (FDO) "initiated surveillance around 10211 Chapel Hill Road," and saw a "Hispanic male matching the description of Mendez" get into a red Honda Civic and drive north. DE 1, paras.5-6. The officers concluded "he would travel to Sangam Mart" at 10300 Chapel Hill Road for work, again based on their "pattern of life" investigation. *Id.*, para.6.

The property at 10300 Chapel Hill Road has a day-care center, a church, restaurants and several stores. There is only one entrance into and one exit from the property. Aerial View of Property, Attach. 1. As one enters, the day-care center is the first building on the right followed

3

by the church. The restaurants and stores are on the left side of the property, with parking lots between the stores and the day care. *Id.*[1]

FDO 1 led the planned administrative arrest of Mr. Mendez and drove a black 2019 Jeep Cherokee. FDO 2 drove a black 2023 8-passenger Subaru Ascent. FDO 3 drove a silver 2018 Hyundai Tucson.

At "around 10:40," FDO 1 reportedly saw a "Hispanic Male" that supposedly matched "the description of Mendez" leaving the residence at 10211 Chapel Hill Road in the Honda. DE 1, para.5. FDO 1 followed the red Honda and FDO2 followed FDO 1. *Id.*, para.6.

When the red Honda entered 10300 Chapel Hill Road, FDO 3 moved his silver Hyundai "in a position to block the Target Vehicle from entering the parking lot." *Id.*, para.7. Both FDO 1 and 3 activated their emergency lights. *Id.*, para.8. FDO 2 then moved the Subaru "aside the driver's side door of the" Honda. *Id.*, para.8. When the Honda stopped, FDO 3 allegedly moved "between their vehicle and the Target Vehicle." *Id.*, para.9. The driver of the Honda put the car in reverse and "collided with FDO 1's" Jeep Cherokee. The driver then "drove forward, colliding into" FDO 2's Subaru and FDO 3's Hyundai. *Id.* The driver of FDO 3 reportedly had to "move out of the way of the incoming Target Vehicle, fearing for their life." *Id.*

Agent Gray's affidavit then states: "After colliding with FDO 3's vehicle, the Target Vehicle collided with FDO 2's vehicle a second time, then drove over the curb, through a garden bed, and collided with an unrelated and previously parked vehicle[.]" *Id.*

Once the officers took Mr. Roblero into custody, they discovered they had mistakenly targeted him rather than Mr. Mendez. An ambulance came and took Mr. Roblero to the hospital. According to the government, Mr. Mendez remains at large.

---

[1] In the Aerial View Attachment 1: A is the Sangam Mart; B is the location of the vehicular interdiction; C is where the red Honda ended up; and D is the Tech Store that provided videos of the interdiction.

2. The Officers' Version is Inconsistent with the Actual Evidence.

Based on the discovery received thus far, none of the officers had bodycams and their vehicles lacked dash cams. Fortunately, two of the stores had cameras that recorded the ERO's interdiction of the red Honda. The first is from a tech store at the far left of the row of stores, labeled Clip_Office_Camera_5_103226_104726. (Tech Store video). The second is from the Sangam Mart, at the far right of the row of stores, labeled Accident2.mp4. ("Sangam Mart Video). Attach. 2.

This is what the actual evidence shows.

At time hack 8:36 on the Tech Store video, the red Honda turns into the entranceway to 10300 Chapel Hill Road. (actual time, 10:41:05 a.m.). It stops before turning left into the parking lot when FDO 3, in the silver Hyundai, pulls in front of the Honda at 8:46. (10:41:15 a.m.).

At 8:50, FDO 1, in the Jeep Cherokee, and FDO 2, in the black Subaru Ascent, drive up behind the Honda. (10:41:15 a.m.). The Honda's reverse lights come on at 8:56, just as FDO 1 pulls up behind the Honda. (10:41:25 a.m.). The Honda backs up slowly for one second and bumps the front of FDO 1.

At 8:57, the Honda's front wheels turn to the left, and starts moving away from the officer from FDO 3, who has left the silver Hyundai. (10:41:26 a.m.). FDO 3 goes around the front of the Hyundai and keeps moving toward the red Honda. But, at no point is FDO 3 between the front of the Honda and FDO's Hyundai. The video does not support the allegation that FDO 3 was between the silver Hyundai and the red Honda, nor that FDO 3 moved "out of the way of the incoming" red Honda. DE 1, para.9. In fact, the video shows that FDO 2 caused the red Honda to collide with the right rear of the silver Hyundai.

5

The videos also contradict the allegation that the red Honda drove into FDO 2, the black Subaru, then drove over a curb into a parked car. Between 8:57 and 9:06, FDO 2 continues driving forward on the left side of the Honda, preventing it from turning left into the parking lot. (10:41:26 – 10:41:34 a.m.). FDO 2 forces the Honda into the back right quarter panel of the Hyundai. It then continues to ram the Honda from the rear and side, pushing it over the curb onto the garden bed and into the privately parked car, a Porsche belonging to a doctor who works at a medical center next to Sangam Mart. The Sangam Mart video also shows the Subaru ramming and pushing the Honda through the parking lot, over the curb and garden bed and into the parked Porsche.[2]

Finally, the Tech Store video shows one of the FDOs moving the black Subaru from behind the red Honda, between time hacks 11:07 and 11:20 (between 10:43:46 and 10:43:50 a.m.). Four minutes after moving the Subaru, at 10:47:54 a.m., one of the FDOs calls dispatch to report an accident. Cary Police Call Log, Attach. 3.

A second Tech Store video shows Morrisville Police vehicles arriving at 10:51:59 a.m., four minutes after the dispatch call, and eight minutes after an FDO officer moved the Subaru from behind the Honda. Attach. 2, Clip_Office_Camera_5_104459_105959, time hack 6:55. Morrisville police officer Kimberly Davis conducted the accident investigation and wrote the accident report.

C.  **January 15, 2026 Interview of Morrisville Police Officer**

On January 15, 2026, counsel and his investigator Jose Vega went to the Morrisville Police Station for a pre-arranged interview with Officer Davis. The Police Chief made them wait

---

[2] Time hacks 0:27 - 0:37. The actual time displayed on the Sangam Mart video is incorrect, about 23 minutes ahead of actual time.

for the arrival of Assistant United States Attorney Ashley Foxx, whom the Chief had called upon our arrival. Vega Affidavit, Attach. 4, paras.2-6.

Officer Davis only obtained the immigration officers' version of events. She did not question Mr. Roblero, though he was still on the scene in one of the FDO's car. *Id.*, para.7.

Officer Davis stated that she had bodycam but turned it off when she realized federal immigration officers were involved. *Id.*, para.8. She did not clarify whether the officers pressured her to turn off her bodycam or did so on her own initiative. She did say that the officers took her investigative notes and told her not to report any of their names. *Id*., para.9.

Officer Davis confirmed that the black Subaru was not behind the red Honda when she arrived, stating it had been moved to another section of the parking lot. *Id*., para.10.

Since Officer Davis did not question Mr. Roblero or see the videos, her accident report tracked the FDOs version of events. She wrote that "Vehicle 1" (the Honda) "struck Vehicle 4" (the black Subaru), then "accelerated over the curb in an attempt to elude Vehicle 4 and collided into Vehicle 5" (the Porsche). Accident Report, Attach. 5, p.2. The diagram shows the Honda butted up against the Porsche but shows the Subaru a distance away from those two cars. *Id.*

After the interview, Mr. Vega showed the videos of the interdiction to Officer Davis. He then gave her a flash drive with those videos so she could study them further on her own. Counsel asked her to carefully view the videos to determine whether to modify her report.

Thus far counsel has not received a modified report that is more consistent with the actual evidence -- the videos.

# ARGUMENT

## I. The Video Evidence Demonstrates the Government Cannot Prove Counts I and II Beyond a Reasonable Doubt.

Rule 12(b)(1) of the Federal Rules of Criminal Procedure states: "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." This rule vests a district court "with authority 'to determine issues of fact in such manner as the court deems appropriate.'" *United States v. Jones*, 542 F.2d 661, 665 (6th Cir. 1976) (citation omitted).

The Fourth Circuit agrees: "A district court may consider a pretrial motion to dismiss an indictment where the government does not dispute the authority of the court to reach the motion, and proffers, stipulates, or *otherwise does not dispute the pertinent facts*." *United States v. Weaver*, 659 F3d 353, 356 n.* (4th Cir. 2011) (citing circuit courts that have "almost universally concluded" Rule 12 vests a district court with this authority) (emphasis added); *see also United States v. Hall*, 20 F.3d 1084, 1088 (10th Cir. 1994) ("Under this scenario, a pretrial dismissal is essentially a determination that, *as a matter of law*, the government is incapable of proving its case beyond a reasonable doubt.") (emphasis in original). In such cases, a court may dismiss an indictment for "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). Rule 12(b)(1) authorizes this pretrial dismissal, and 12(b)(3)(B)(v) supplies the vehicle.

Here, the government cannot dispute that the video evidence is the actual, direct evidence of the FDOs' vehicular interdiction on December 2, 2025. Nor should it dispute this Court's authority to rule on this motion.

Based on the following, the government cannot prove either Count I or II beyond a reasonable doubt.

## A. The Government Cannot Prove Count I Beyond a Reasonable Doubt.

Count I alleges Mr. Roblero "did forcibly assault, resist, oppose, impede, intimidate and interfere with" the immigration officers. It further alleges he "caused physical contact, and used a deadly or dangerous weapon, and acted with the intent to commit another felony," in violation of 18 U.S.C. §§ 111(a) & (b). DE 12.

The video evidence demonstrates Mr. Roblero did not act with the requisite force or criminal intent, as 18 U.S.C. § 111 demands.

1. The Government Cannot Prove Mr. Roblero Acted "Forcibly."

The word "forcibly" modifies all the verbs that follow. *United States v. Arrington*, 309 F.3d 40, 44 (D.C. Cir. 2002). It means "any deliberate and intentional attempt or threat to inflict physical injury upon another with force or strength when that attempt or threat is coupled with an apparent present ability to do so." *United States v. Johnson*, 126 F.4th 1000, 1004 (4th Cir. 2025).

Importantly, using a car purely for flight does not satisfy the forcible element. *Arrington*, 309 F3d at 45. Nor does "pull[ing] away" from a traffic stop. *United States v. Quintanilla-Chavez*, __ F. Supp. 3d __, 2025 WL 2982191, *7 (W.D. Tex. Oct. 20, 2025) (internal quotes and citation omitted).

Here, the video evidence refutes any allegation that Mr. Roblero acted "forcibly" toward any immigration officer. His only voluntary act was slowly backing up before attempting to turn left, away from the Hyundai and away from FDO 3, who never gets between the front of the Honda and the Hyundai. When Mr. Roblero backed up, his car inadvertently tapped the bumper of the Jeep Cherokee which approached at a high rate of speed. This "backing away" did not amount to a threat to inflict injury on FDO 1, the driver of the Jeep.

As the video shows, FDO 2's actions in the Subaru caused the subsequent contacts between the Honda, the Subaru and the Hyundai. *Supra*, pp.4-6. FDO 2 intentionally forced the Honda into the right rear of the Hyundai. FDO 2, not Mr. Roblero, caused FDO 3 to almost get hit by the front of his/her own car. FDO 2 then used the Subaru as ram, pushing the Honda through the parking lot, over the curb and garden bed, then into the parked Porsche. FDO 2, not Mr. Roblero, acted "forcibly" within the meaning of 18 U.S.C. § 111.

In sum, the undisputed video evidence defeats the government's ability to prove Mr. Roblero acted "forcibly" beyond a reasonable doubt.

2. The Government Cannot Prove Mr. Roblero Acted With the Requisite Criminal Intent.

To incur criminal liability under § 111, the government must prove a person had the criminal intent to commit each of the alleged acts. It must prove that person had the criminal intent to assault a federal officer, to use an object as a deadly weapon, and to commit another felony. *United States v. Feola*, 420 U.S. 671, 686 (1975); *United States v. McDaniel*, 85 F.4th 176, 186 (4th Cir. 2023).

The video evidence demonstrates Mr. Roblero did not act with the requisite criminal intent to assault an officer or to use the Honda as a deadly weapon.

The videos only show one voluntary act by Mr. Roblero – backing up then trying to turn left around the Hyundai. This demonstrates the intent to avoid hitting the Hyundai, not the opposite. The video also shows that FDO 2 continued moving forward when Mr. Roblero initiated the attempt to turn left. Again, FDO 2's actions caused the contact between his/her car, the Honda, and the Hyundai.

Next, the government cannot prove beyond a reasonable doubt that Mr. Roblero intended to flee. Rather, according to their own "pattern of life" investigation, they expected the driver of

10

the Honda to park near his place of work, the Sangam Mart. Moreover, the officers initiated the interdiction at the only entrance to the property, right next to the day-care center. Rather than block the only entrance, the more reasonable and safer alternative for Mr. Roblero was to enter the parking lot and surrender to immigration officers.

Finally, the indictment's allegations contradict each other. It alleges Mr. Roblero intended to forcibly ram the Hyundai and simultaneously intended to flee. Intentionally ramming the Hyundai would defeat any attempt to flee.

In sum, the indisputable video evidence demonstrates the government cannot prove beyond a reasonable doubt that Mr. Roblero violated 18 U.S.C. § 111. The Court should dismiss Count I.

**B. The Government Cannot Prove Count II Beyond a Reasonable Doubt**.

Count II alleges that Mr. Roblero "willfully" damaged three government vehicles, causing damages more than $1000, in violation of 18 U.S.C. § 1361. DE 12. "[T]he willful intent requisite to constitute a violation of [this statute] is the intent on the part of the accused to commit the proscribed acts with knowledge that they were violating the statute." *United States v. Moylan*, 417 F.2d 1002, 1004 (4th Cir. 1969).

The government cannot prove beyond a reasonable doubt that Mr. Roblero intended to damage any of the three government vehicles – the Jeep Cherokee, the Subaru or the Hyundai. The video evidence shows he tried to avoid hitting the Hyundai, an effort stymied by the driver of the Subaru. FDO 2's actions caused damage to his/her own vehicle and to the Hyundai. FDO 2 could have let Mr. Roblero turn left into the parking lot rather than continue moving forward, hitting the Honda, forcing it into the Hyundai, and damaging his/her own vehicle.

Nor did Mr. Roblero intend to damage the Jeep Cherokee by slowly backing up to get around the Hyundai. His intent was to avoid hitting the Hyundai, not to damage the Jeep. It merits

11

emphasis that the Honda's reverse lights activated just before the Jeep Cherokee stopped behind the Honda, yet the Jeep did not give Mr. Roblero space to back up.

Based on the pictures of the Jeep's front bumper, there is no apparent damage. Jeep Pictures, Attach. 6. The repair estimate of $375 is for what appears to be cosmetic repairs, removing the specs of red paint and buffing the front bumper. Attach 6. Since the estimated 'damage' does not exceed $1000, § 1361's felony provision cannot even apply to the Jeep.

In sum, the government cannot prove beyond a reasonable doubt that Mr. Roblero intended to damage any of the three government vehicles or that he had knowledge his act of backing up violated 18 U.S.C. § 1361. The Court should dismiss Count II.

## II. The Immigration Officers Violated the Fourth Amendment.

The immigration officers violated the Fourth Amendment twice. First, they lacked probable cause to arrest Mr. Roblero. Mistaking him for Mr. Mendez was objectively unreasonable. Second, their aggressive and dangerous use of their vehicles to execute an administrative arrest constituted excessive force. Each constitutional violation requires dismissal of the indictment.

### A. Mistakenly Targeting Mr. Roblero was Objectively Unreasonable.

An arrest based on mistaken identity must be objectively reasonable to comport with the Fourth Amendment. *Hill v. California*, 401 U.S. 797, 802-04 (1971) ("subjective good-faith belief would not in itself justify" a mistaken-identity arrest).

Here, the immigration officers' investigative failures resulted in the unreasonable targeting of Mr. Roblero.

The officers reportedly first targeted Mr. Mendez on November 12, 2025, when a Fuquay-Varina police officer charged him with misdemeanor contributing to the delinquency of a minor. According to ICE officers, Mr. Mendez had an outstanding immigration removal order. On

12

November 13, 2025, a Morrisville police officer arrested him on the misdemeanor charge. Arrest Record Report, Attach. 7. This report listed 10211 Chapel Hill Road, Morrisville, as the residential address. *Id.* According to a text message received in discovery Mr. Mendez was booked into jail at 6:48 p.m. on November 13, and released at 1:22 a.m. on November 14, before the jail received an ICE detainer. The release order gives a residential address for him in Cary, not Morrisville. Release Order, Attach. 8.

Discovery received thus far indicates the immigration officers did not make any attempt to confirm Mr. Mendez's actual residential address.[3] They did not contact the owner of the Morrisville residence at 10211 Chapel Hill Road, to find out whether he lived there. Nor did they attempt to encounter Mr. Mendez at the Cary address listed in the release order.

Regarding the red Honda, no discovery received thus far demonstrates grounds to assert it was "known to be utilized by Mendez," as the Complaint alleges. DE 1, para. 5. The Honda was registered to Mr. Roblero's brother, not Mendez, and used by Mr. Roblero.

Moreover, other than asserting Mr. Roblero "match[ed] the description of Mendez," *id.*, para. 5, no reports received thus far detail the supposed similarities between the two other than both being Hispanic. Since Mr. Roblero and not Mr. Mendez lived at 10211 Chapel Hill Road and drove the red Honda to and from work, the immigration officers mistook him for Mr. Mendez from the start and finish on November 29, 2025, hardly a "pattern of life" investigation.

Finally, the government has not produced any photos, images or videos taken during the supposed "pattern of life" surveillance and investigation. No discovery received thus far confirms

---

[3] Counsel has requested all reports, communications and images or videos related to the "pattern of life" investigation but has only received documents mentioning a surveillance on November 29, 2025, at 10211 Chapel Hill Road, Morrisville.

13

the immigration officers ever saw Mr. Godinez-Mendez at the 10211 Chapel Hill Road residence or verified that he drove the red Honda.

In sum, the sole basis for targeting Mr. Roblero on December 2, 2025, was an address on the arrest report inconsistent with the address on the release report, and an assertion that one Hispanic male "matched" the description of another. The immigration officers' subjective belief that this sufficed was objectively unreasonable. They did not have probable cause to target Mr. Roblero and execute what amounted to an aggressive and violent 'felony stop,' in violation of his Fourth Amendment rights against unreasonable seizures. *Hill*, 401 U.S. at 802-04.

### B. The Officers Used Excessive Force to Conduct an Administrative Arrest.

"The Fourth Amendment bars police officers from using excessive force to effectuate a seizure." *Yates v. Terry*, 817 F.3d 877, 884 (4th Cir. 2016). "Courts evaluate a claim of excessive force based on an 'objective reasonableness' standard." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 399 (1989)). "Courts are to carefully balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 884-85 (citations and internal quotation marks omitted). "[P]roper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

The first factor – severity of the crime – does not even apply here. The immigration officers only needed to conduct an administrative arrest to place Mr. Godinez-Mendez into removal proceedings. *See Arizona v. United States*, 567 U.S. 387, 407 (2012) ("As a general rule, it is not a crime for a removable alien to remain present in the United States.").

14

Case 5:25-cr-00303-FL-RJ     Document 22     Filed 02/20/26     Page 14 of 20

Second, when he tried to get around the Hyundai to leave his car in the parking lot, Mr. Roblero did not pose an immediate threat to the safety of the immigration officers. This second factor is "the most important." *Lewis v. Caraballo*, 98 F.4th 521, 531 (4th Cir. 2024). It was FDO 2 who jeopardized the safety of FDO 3 by forcing the Honda into the Hyundai rather than let Mr. Roblero enter the parking lot and surrender to the immigration officers.

Third, the evidence does not support the officers' subjective belief that Mr. Roblero intended to flee. He started moving forward slowly, turning his wheels to the left to get around the Hyundai. It would have been difficult, if not impossible, to then make an immediate U-turn to exit the property which only had one entrance and exit.

The officers had safer alternatives to conduct an administrative arrest. With eight available officers and agents, they could have converged on Mr. Roblero as he left his residence or after he parked his car to go to work. And with so many vehicles, some could have simply blocked the only exit from the parking lot.

Instead, they chose to execute a blocking maneuver at the only entrance to the property, right next to a day-care center. FDO 2 then rammed Mr. Roblero's car, pushing it through the parking lot, over the garden bed, into the Porsche. This likely violated ICE's own policy and regulations restricting offensive driving techniques (ODTs) like FDO 2's aggressive PIT[4] maneuver. *See Chicago Headline Club v. Noem*, __ F. Supp. 3d __, 2025 WL 3240782, *11 (N.D. Ill. Nov. 20, 2025) (citing ICE policy that prohibits using "ODTs in school zones where children are present or going to or from school or where the danger to the public outweighs the enforcement benefit"); *see also* 8 C.F.R. § 287.8 (a)(1)(iii) ("A designated immigration officer shall always use the minimum non-deadly force necessary to accomplish the officer's mission and shall escalate to

---

[4] Precision Immobilization Technique, a law enforcement tactic used to stop a vehicle by intentionally causing it to spin, forcing a stop.

a higher level of non-deadly force only when such higher level of force is warranted by the actions, apparent intentions, and apparent capabilities of the suspect.").

In sum, the FDO's aggressive and dangerous vehicle interdiction was objectively unreasonable in violation of the Fourth Amendment. They "engaged in constitutionally excessive force." *Quintanilla-Chavez*, __ F. Supp. 3d __, 2025 WL 2982191, *17.

The exclusionary rule is the typical remedy for a violation of an individual's Fourth Amendment rights. However, cases such as Mr. Roblero's often arise where there is no tangible evidence to suppress, and a *Bivens* claim is all-but foreclosed, see *Egbert v. Boule*, 596 U.S. 482, 498 (2022). In such cases, this Court cannot "'shirk the responsibility that is necessarily in its keeping . . . to accommodate the dangers of overzealous law enforcement.'" *United States v. Twigg*, 588 F.2d 373, 380 (3d Cir. 1978) (quoting *Sherman v. United States*, 336 U.S. 369, 381 (1958)). When "federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bell v. Hood*, 327 U.S. 678, 684 (1946). The remedy required here is dismissal of the indictment.

Alternatively, Mr. Roblero moves to suppress all evidence and testimony from the time FDO 3 executed the blocking maneuver. *Quintanilla-Chavez*, __ F. Supp. 3d __, 2025 WL 2982191, *18 (suppressing "all observations and recordings (visual and audio) of the Defendant's alleged resistance").

### III. The Court Should Dismiss the Indictment Pursuant to Judicial Supervisory Authority.

The government's failure to show sufficient evidence to sustain Counts I and II, and the Fourth Amendment violations each warrant dismissal of the indictment.

Alternatively, the Court can rely on its supervisory powers to dismiss the indictment. *United States v. Hasting*, 461 U.S. 499, 505 (1983) ("Guided by considerations of justice, and in

16

Case 5:25-cr-00303-FL-RJ     Document 22     Filed 02/20/26     Page 16 of 20

the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or Congress."); *United States v. Escobedo-Molina*, 790 F. Supp. 3d 1283, 1288-89 (D.N.M. 2025) ("A federal court may dismiss charges in reliance on its supervisory powers."); *see also United States v. Houghton*, 554 F.2d 1219, 1224 (1st Cir. 1977) (emphasizing, "the dismissal of an indictment because of deliberate governmental misconduct is used as a prophylactic tool for discouraging future actions of the same nature").

The Court should exercise its inherent authority to dismiss the indictment for the following four reasons.

First, FDO 2's unreasonable use of a dangerous PIT maneuver to conduct an administrative arrest endangered Mr. Roblero and implicated the Fifth Amendment's substantive due process protections. While FDO 2 did not purposefully endanger Mr. Roblero, his recklessness inched close to "a harmful purpose to spark the shock that implicates constitutional protections." *County of Sacramento v. Lewis*, 523 U.S. 833, 853 & 847 (1998) ("Only a purpose to cause harm unrelated to the legitimate object of arrest" offends due process).

Second, the FDOs misconduct requires the "prophylactic tool for discouraging future actions of the same nature." *Houghton*, 554 F.2d at 1224. Their statements to FBI Agent Gray and Officer Davis concealed the truth and resulted in an affidavit and accident report containing false statements. The FDO's moved the Subaru before Officer Davis arrived, resulting in an inaccurate accident report. Even more troubling, the FDOs usurped Officer Davis's authority over the investigation of the 'accident.' They moved the Subaru from the scene of the accident, took her investigative notes, likely made her turn off her bodycam, and forbade her from including their names in her report. They had no such authority over a local police matter and did so to slant the accident report to their favor.

Third, after reviewing the videos and noting the inconsistencies between the FDOs statements and the actual evidence, the government should not have even brought these charges. *United States v. Briggs*, __ F. Supp. 3d __, 2025 WL 3240894, *4 (N.D. Ill. Nov. 20, 2025) ("Any reasonable federal prosecutor knows that federal charges, or any actions by the United States Attorney directed at its citizenry, must be undertaken with the utmost care."). Traditionally, this "utmost care" required a federal prosecutor to verify sufficient evidence existed to support proof beyond a reasonable doubt for every element of each charge. Here, after viewing the videos on January 15, 2025, government counsel stated it "was open to interpretation" whether FDO 2 rammed and pushed the red Honda. Vega Affidavit, Attach. 4, para.11. Not a ringing endorsement for proof beyond a reasonable doubt. The government should do the right thing and dismiss the indictment. If not, this Court should.

Finally, the troubling conduct of the immigration officers is this case is not unique. Rather, it has spread like COVID throughout the country. *See Briggs,* 2025 WL 3240894, * 4 (dismissing § 111(a) charge with prejudice, lamenting "judicial determinations that DHS sworn statements are unreliable"); *Quintanilla-Chavez*, 2025 WL 2982191, *3 (dismissing § 111 indictment, noting the "sworn affidavit submitted in support of the Criminal Complaint in this matter tells a very different – and largely fictional – story"); *Escobedo-Molina*, 790 F. Supp. 3d at 1295 (exercising supervisory authority to dismiss charges with prejudice "in order to deter the Government from its repeated disregard for statutory and constitutional rights").

In *United States v. Aljorna, et al*, the government recently moved to dismiss § 111 charges against two men, stating: "Newly discovered evidence in this matter is materially inconsistent with the allegations in the Complaint Affidavit." Case No. 26-mj-23 (PAM/DLM) (D. Minn. Feb. 11, 2026). Motion and Order, Attach. 10. In *United States v. Marimar Martinez, et al*, a case that

18

Case 5:25-cr-00303-FL-RJ    Document 22    Filed 02/20/26    Page 18 of 20

garnered national attention, the court dismissed the § 111 violations with prejudice, after the government moved to dismiss. Case No. 1:25-CR-636-GNA (N.D. Ill. Nov.20, 2025). Attach. 11.

These cases show a true and troubling pattern, unlike the officers' one-day "pattern of life" investigation in this case.

The Court should dismiss the indictment, to ensure that the troubling pattern nationwide does not take root in the Eastern District of North Carolina.

## CONCLUSION

For each of the foregoing grounds, the Court should dismiss the indictment.

Respectfully submitted this 20th day of February, 2026.

> G. ALAN DuBOIS
> Federal Public Defender
>
> ***/s/ James E. Todd, Jr.***
> JAMES E. TODD, JR.
> Assistant Federal Public Defender
> Attorney for Defendant
> Office of the Federal Public Defender
> 201 South Evans Street, Suite 153
> Greenville, North Carolina 27858
> Telephone: 252-830-2620
> Fax: 252-830-2232
> E-mail: Jay_Todd@fd.org
> N.C. State Bar No. 28832
> LR 57.1 Counsel Appointed

*CERTIFICATE OF SERVICE*

I hereby certify that a copy of the foregoing was served upon:

ASHLEY H. FOXX
United States Attorney's Office
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601


by electronically filing the foregoing with the Clerk of Court on this date, using the CM/ECF system which will send notification of such filing to the above.

This, the 20th day of February, 2026.

                                               ***/s/ James E. Todd, Jr.***
                                               JAMES E. TODD, JR.
                                               Assistant Federal Public Defender
                                               Attorney for Defendant
                                               Office of the Federal Public Defender
                                               201 South Evans Street, Suite 153
                                               Greenville, North Carolina 27858
                                               Telephone: 252-830-2620
                                               Fax: 252-830-2232
                                               E-mail: Jay_Todd@fd.org
                                               N.C. State Bar No. 28832
                                               LR 57.1 Counsel Appointed